[Cite as *State v. Barnes*, 2010-Ohio-987.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY


STATE OF OHIO,                 CASE NO. 2-09-23

    PLAINTIFF-APPELLEE,

  v.

JASON BARNES,                **O P I N I O N**

    DEFENDANT-APPELLANT.


**Appeal from Auglaize County Municipal Court**
**Trial Court No. 09-TRD-01447**

**Judgment Affirmed**

**Date of Decision:  March 15, 2010**


**APPEARANCES:**

    *Jason Barnes* **for Appellant**

    *Edwin A. Pierce* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Jason L. Barnes, appeals the July 10, 2009 judgment of the Auglaize County, Ohio Municipal Court, finding him guilty of speeding, eighty-four miles per hour in a sixty-five miles per hour zone, in violation of 4511.21(D)(2), and ordering him to pay a fine of $35.00, to pay court costs, and to be assessed two points on his driver's license.

{¶2} The facts relevant to this appeal are as follows. On March 17, 2009, at approximately 2:52 p.m. Barnes was traveling on Interstate 75 in Auglaize County, Ohio, near the exit for U.S. Highway 33. At this time, Trooper Pilot Darwin Justice, Jr., of the Ohio State Highway Patrol ("OSHP"), Aviation Department, was performing speed enforcement in the area through the use of an OSHP airplane.

{¶3} Trooper Pilot Justice noticed a white vehicle traveling in a marked one-mile section of the roadway between mile markers 108 and 109. This marked one-mile section was further divided into quarters, which were marked by white epoxy transfer mats. The pilot did not notice the white vehicle until it was approximately half-way into the first marked quarter. When the white vehicle entered the second marked quarter, the pilot began timing the vehicle until it entered the third marked quarter and then also timed the vehicle through the third and fourth marked quarters. Using the time-speed-distance math formula, the pilot

determined the speed of the white vehicle to be eighty-four miles per hour in both the second and third quarters of the mile and seventy-seven miles per hour in the fourth quarter.

{¶4} Upon observing the white vehicle to be speeding, Trooper Pilot Justice called Trooper Michael Keaton, who was stationary in a marked patrol car on the berm of the roadway at mile marker 110, to prepare him to stop the white vehicle. Trooper Keaton exited his vehicle upon being informed by the pilot that the white car was coming towards him. Trooper Keaton, using hand signals, ordered the white vehicle to pull over, which it did. The pilot then told Trooper Keaton that he had stopped the correct vehicle and that the vehicle was traveling at eighty-four miles per hour at 2:52 p.m. At the time of the stop, Barnes was driving the white vehicle at issue.

{¶5} Trooper Keaton issued a traffic citation to Barnes for speeding. This citation was filed in the Auglaize County Municipal Court on March 18, 2009, and Barnes, pro se, entered a written plea of not guilty that was filed on March 24, 2009. A telephonic pre-trial was conducted on April 7, 2009,[1] and the matter was scheduled for a bench trial to commence on May 8, 2009. On May 8, 2009, a letter to the court from Barnes, dated May 1, 2009, was filed in the case. This

---

[1] Barnes lives in the State of Kentucky.

letter requested the court's assistance in obtaining certain items in discovery from the prosecution. That same date, the court conducted Barnes' bench trial.

**{¶6}** No oral motions were made to the court on the record prior to the commencement of the trial. The prosecution presented the testimony of Trooper Pilot Justice and Trooper Keaton and introduced one exhibit, the pilot's aviation enforcement report that contained his notes about the vehicle speeds he checked on the day of Barnes' citation. These witnesses were also subjected to cross-examination by Barnes.

**{¶7}** At the conclusion of the State's evidence, Barnes testified on his own behalf. During his testimony, Barnes testified that his employer uses a global positioning system ("GPS") through his Verizon Wireless cellular phone, which provides his location and his speeds while traveling for his employer and alerts his employer if he drives in excess of the posted speed limit. Barnes introduced nine exhibits in support of this testimony. Specifically, Barnes testified that Defendant's Exhibits 1-6 were documents downloaded from the internet from the GPS provider that reflect the speeds and path of travel for him from 2:46 p.m.-2:54 p.m.,[2] on the day in question, which showed his rate of speed was not in excess of the posted speed limit as testified to by Trooper Pilot Justice. These documents show his speeds as follows: 2:46 p.m. – 57 mph; 2:48 p.m. – 50 mph;

---

[2] The actual times on these documents are from 1:46 p.m.-1:54 p.m. However, Barnes testified, and the documents reflect, that these were times for the Central Time Zone, which is the time zone in which his employer operates.

2:50 p.m. – 44 mph; and 2:52 p.m. – 50 mph. The other three exhibits introduced by Barnes were internet downloads from Wikipedia that discussed some aspects of GPS. Barnes presented no other witnesses.

{¶8} The court asked questions of Barnes regarding the GPS documents, some of which Barnes could not fully answer and some of which he had to speculate as to the answer. The court retained Barnes' exhibits and told him that the court was desirous of knowing more about the program and was willing to conduct some research to determine whether he could consider Barnes' exhibits. The prosecutor objected to the admission of these exhibits because Barnes did not present any evidence regarding the accuracy of the information, the equipment/program used to determine the speeds, the calibration of any equipment used to determine the speeds, and the scientific reliability of the equipment/program.

{¶9} The court took the matter under advisement. On May 12, 2009, the court filed an entry allowing Barnes until May 26, 2009, to submit the manual for the GPS to help enable the court to interpret Barnes' exhibits. On May 15, 2009, Barnes filed a motion to dismiss his case because the prosecutor failed to provide him with (1) a copy of the video from the ground trooper's cruiser, which he maintained would show that there were other cars in the area that matched the description of his car and would provide the audio of the conversation between the

pilot and the ground patrol, and (2) the ground trooper's notes/log that would show the tickets he gave to other motorists that day. This motion was overruled later that same day.

{¶10} On July 10, 2009, the trial court rendered its decision in writing. In this entry, the court noted that it had permitted Barnes to submit further documentary evidence to explain the information contained in his exhibits but that Barnes did not do so, and the court noted that it was not able to obtain any other documentary evidence. Thus, the court found that Barnes had failed to support the technology upon which he was relying to refute that he was speeding.[3] The court then found Barnes guilty of speeding as charged in his citation. This appeal followed, and Barnes now asserts three assignments of error.

### ASSIGNMENT OF ERROR I

**TRIAL COURT ERRORED [*sic*] BY DENYING THE DEFENDANT THE PROMISED CHANCE TO GIVE CLOSING ARGUMENTS (SUMMATION), BUT ALLOWED ONLY THE PROSECUTION THE CHANCE TO GIVE THEIR CLOSING ARGUMENTS.**

### ASSIGNMENT OF ERROR II

**TRIAL COURT ERRORED [*sic*] BY MAKING DECISION BASED ON EXPERIMENTS/OBSERVATIONS NOT**

---

[3] The record contains a compact disc, purportedly supplied by Barnes on an unknown date. On this disc are a letter to the court, with Barnes' cellular phone account information, and the manual for the GPS. The court noted in a separate entry on July 17, 2009, that it received this information and considered it in reaching its decision. The court also noted that it contacted the GPS provider for additional information, as suggested in Barnes' letter, but was unable to obtain any further information.

**ENTERED INTO EVIDENCE BY EITHER PROSECUTION OR DEFENSE.**

**ASSIGNMENT OF ERROR III**

**CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶11} For ease of discussion, we elect to address these assignments of error out of the order in which they appear.

*Third Assignment of Error*

{¶12} In his third assignment of error, Barnes maintains that his conviction was against the manifest weight of the evidence. Specifically, Barnes asserts that the prosecution lacked evidence particular to his citation, having only put forth evidence regarding speeding citations in general. He further contends that it would have been quite easy for the pilot to have erred because the pilot was performing a number of tasks simultaneously. He also maintains that his GPS evidence was easy to understand, did not need an expert to explain it, and conclusively established he was not speeding.

{¶13} An appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 1997-Ohio-52. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the

conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3rd Dist. No. 1-05-70, 2006-Ohio-3764, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Further, we must be mindful that the credibility to be afforded the testimony of the witnesses is to be determined by the trier of fact. *State v. Dye*, 82 Ohio St.3d 323, 329, 695 N.E.2d 763, 1998-Ohio-234; *State v. Frazier*, 73 Ohio St.3d 323, 652 N.E.2d 1000, 1995-Ohio-235.

{¶14} In order to prove the allegations contained in the citation, the State had to show beyond a reasonable doubt that on or about March 17, 2009, Barnes operated a motor vehicle upon a freeway in Auglaize County, Ohio, "[a]t a speed exceeding sixty-five miles per hour[.]" See R.C. 4511.21(D)(2). As previously noted, in its case-in-chief, the State presented the testimony of Trooper Pilot Justice. He testified that he has been in the aviation department since April of 2005. He then explained in detail how he detects the speed of vehicles from his aircraft through the use of two calibrated stop watches, a one-mile portion of the roadway that is marked by white epoxy mats by the Ohio Department of

Transportation through the use of survey equipment and is further divided into quarters by these same type of mats, and application of the time-speed-distance math formula. Once the pilot is able to ascertain the unlawful speed of a particular vehicle, he then contacts law enforcement on the ground to stop the vehicle. He observes the stopped vehicle to ensure that the ground unit has stopped the correct vehicle and then informs the ground unit of the speed of the vehicle and the time the speed was detected. The ground unit then issues the citation to the driver.

{¶15} As for the calibration of his watches, Trooper Pilot Justice testified that on or about the fifteenth day of each month, his watches are timed for two minutes using an audible signal from Station WWB in Fort Collins, Colorado, that is in timing with the atomic clock at the Naval Observatory in Washington, D.C., which he stated is the most accurate time keeping device in the world. He then ensures that the two watches are within 1/10 of one second of each other. He also performs a comparison calibration check at the beginning and end of each enforcement day by timing his watches for a certain time frame, giving him a certain speed, and compares that to a comparison calibration chart to ensure that the elapsed time shown is the speed that it should be.

{¶16} The pilot testified that in Barnes' case, on the day in question, he first observed a white vehicle, later determined to be driven by Barnes, half-way through the first marked quarter-mile section. As this vehicle entered the second

quarter-mile section, meaning the moment the front bumper/grill portion of the white vehicle met the second white epoxy mat, he began timing the vehicle with his two stop watches. At the end of the second section, the pilot noted that 10.68 seconds had elapsed, giving him a speed of eighty-four miles per hour. He also timed the vehicle through the third and fourth quarters, ascertaining the elapsed time at 10.66 seconds and 11.61 seconds, respectively, giving him speeds of eighty-four miles per hour for the third quarter and seventy-seven miles per hour for the fourth quarter. The pilot also testified that he visually observed that Barnes' vehicle was traveling in excess of sixty-five miles per hour. He further testified that the traffic was light to moderate and that there were no other similar vehicles in the area, specifically no white vehicles with the exception of the OSHP cruisers that were assisting him.

{¶17} Once Trooper Keaton stopped Barnes' vehicle, Trooper Pilot Justice confirmed that this was the correct vehicle and supplied Trooper Keaton with the time of the violation and the speed. The pilot also wrote the elapsed times and speed determinations for each quarter, a description of the vehicle, the lane of travel of the vehicle, and the time of the violation on his aviation enforcement report, which was admitted as State's Exhibit 1. This report also reflects that a comparison calibration check was performed at 8:00 a.m. and again at 3:30 p.m. on March 17, 2009. Trooper Pilot Justice also testified that he was positive that

the vehicle he determined was speeding was the vehicle stopped by Trooper Keaton, which was the vehicle driven by Barnes.

{¶18} Trooper Keaton's testimony corroborated the pilot's testimony as to the communications between the two regarding the stop of Barnes. Trooper Keaton also identified Barnes as the driver of the white vehicle that Trooper Pilot Justice stated was traveling eighty-four miles per hour. Trooper Keaton further testified that the posted speed limit for that portion of the highway was sixty-five miles per hour and that the offense occurred in Auglaize County, Ohio.

{¶19} To the contrary, Barnes testified that his speed was detected through his Verizon Wireless cellular phone. He testified that his employer utilizes a GPS program to detect the location and speed of its employees when traveling through their cellular phones and that this program actually sends alerts to his employer if one of its employees is speeding. As previously noted, he submitted downloaded documents regarding his speed and location when the troopers stopped him on March 17, 2009. These documents reflected a rate of speed of fifty miles per hour at the time the troopers purported that he was traveling at eighty-four miles per hour. However, Barnes did not have an independent recollection of his speed at that time. In addition, Barnes testified that the GPS provided the average of his speed over a two-minute time frame. In other words, the GPS did not give his specific speed at a specific time, but an average speed over two minutes.

{¶20} Further, Barnes presented no evidence from a person with personal knowledge regarding how the GPS calculates speed, whether there is any type of calibration of the equipment used to detect speed, whether the methods employed by his particular company to detect speed are scientifically reliable, or the accuracy of the GPS' speed detection. To the contrary, Barnes only offered a download from Wikipedia about some aspects of GPS and his opinion that the company providing this service expended a substantial amount of money into research and development and that those controlling this program have "more training, more expertise than either of these two (2) officers have." As for the compact disc submitted by Barnes after the conclusion of the trial to assist the court in interpreting his exhibits, the manual contained on the disc provides little to no helpful information in determining the method by which the speed calculations are made or the reliability thereof.

{¶21} Given all of the evidence, we find that the credible evidence clearly supports the trial court's judgment that Barnes was traveling in excess of sixty-five miles per hour on Interstate 75, a freeway, on March 17, 2009, in Auglaize County, Ohio. As such, we cannot find that the trial court, acting as the factfinder in this case, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Therefore, the third assignment of error is overruled.

*Second Assignment of Error*

**{¶22}** Barnes asserts in his second assignment of error that the trial court impermissibly considered evidence outside of what was presented at trial. More specifically, Barnes maintains that the following statement in the court's judgment entry was an improper attempt to "fill the holes in the prosecution's lack of evidence":

> **The Court finds that the speeds indicated by the GPS program do not even match what the testimony of the defendant would indicate as to his speed while on I 75. The defendant claimed that he was not speeding due to the fact that he was caught up with truck traffic on I 75 but it would be highly unusual for truck traffic in good weather to be traveling at speeds as slow as those indicated by the GPS system.**

Barnes likens this statement to a juror who conducts an experiment to aid in the deliberation of a case.

**{¶23}** Barnes is correct that factfinders are not permitted to consider outside influences, such as communications with others not serving in the same factfinder capacity and independent experiments, about the matter at trial. See *State v. Kehn* (1977), 50 Ohio St.2d 11, 361 N.E.2d 1330; *State v. Spencer* (1997), 118 Ohio App.3d 871, 873-874, 694 N.E.2d 161; *State v. King* (1983), 10 Ohio App.3d 161, 165, 460 N.E.2d 1383. However, not every such instance requires reversal, as the outside influence must have been prejudicial; i.e. materially affected a defendant's substantial rights. *King*, supra.

-13-

{¶24} Here, the statement by the trial court did not reflect that the court had conducted any outside experiment or improperly considered evidence outside the record. Rather, the court was addressing Barnes testimony that he believed he was caught behind truck traffic, which could possibly explain why he was traveling at a speed of only fifty miles per hour on the interstate. The court did not indicate that this scenario was impossible but merely that it was highly unlikely given the weather conditions and the type of roadway. Thus, the court was not considering "outside evidence."

{¶25} Furthermore, even assuming *arguendo* that the court was improperly considering outside evidence, a reversal of his conviction is not warranted. Given the testimony of the two troopers and the lack of any evidence as to the reliability of Barnes' exhibits, the court's consideration of the unlikelihood of truck travel at a low rate of speed for the interstate was harmless. Thus, the second assignment of error is overruled.

*First Assignment of Error*

{¶26} In his first assignment of error, Barnes contends that his conviction should be reversed because the trial court failed to allow him to present a closing argument. The United States Supreme Court has held that a statute permitting a trial judge to deny a criminal defendant closing argument denies "the basic right of the accused to make his defense" in violation of the Sixth Amendment of the

United States Constitution. *Herring v. New York* (1975), 422 U.S. 853, 859, 95 S.Ct. 2550. Thus, a trial court is not permitted to *totally* deny a criminal defendant the opportunity to present a closing argument whether his trial is to a jury or to the bench. *Id.*, see also, e.g., *State v. McCausland*, 124 Ohio St.3d 8, 918 N.E.2d 507, 2009-Ohio-5933, at ¶ 6. However, the right to present a closing argument may be waived. *Id.* at ¶ 7, citing *Yopps v. State* (1962), 228 Md. 204, 207, 178 A.2d 879. Recently, the Ohio Supreme Court held that such a waiver need not be express, intentional, and voluntary. *McCausland*, 2009-Ohio-5933, ¶¶ 8-10. Rather, "[a] criminal defendant waives the Sixth Amendment right to present a closing argument when he or she neither requests a closing argument nor objects to its omission." *Id.* at syllabus.

{¶27} In the case sub judice, Barnes represented himself and testified on his own behalf. After the State cross-examined him, Barnes continued his testimony, in effect conducting a re-direct examination in narrative form. The court then began asking questions of Barnes concerning his GPS documents. After answering these questions of the court, the following discussion occurred:

> **BARNES: Your honor will I have chance to address the court also as we get down, I mean aside from own testimony or, I do or [*sic*]?**
>
> **BECKETT [the prosecutor]: You have a chance to summarize in closing arguments.**
>
> **COURT: Mm huh.**

**BECKETT: But not through testimony.**

**COURT: Do you have anything else that you want to testify here here [*sic*] to today?**

Barnes then proceeded to provide what can only be described as an argument. For instance, Barnes made statements to discredit the troopers' testimony, commented on how the GPS was much more accurate than "the skeptical way" the troopers testified, discussed his pre-trial conversations with another prosecutor who he maintained only wanted to offer a plea rather than hearing Barnes' evidence, commented on the prosecutor's motives in this case, and then began to state what he might do if he were ever to be seated as a juror in the future. This last statement prompted the trial court to admonish Barnes about implying that he would act improperly if seated as a juror or refuse to sit on a jury because of his current case.

{¶28} After this statement by Barnes, the trial court then asked the State: "Anything the state wants to present as to closing argument, well do you have rebuttal testimony?" The prosecutor then informed the court that she did not intend to present rebuttal testimony and proceeded with her closing argument. After the prosecutor's summation, the court informed the parties that it would take the matter under advisement, discussed how it would have to research the issue concerning the GPS, and then told Barnes that it had been informed that he was

discussing his case on a local radio station and that this was "probably not appropriate." The court specifically stated that it did not know what exactly the conversation was about or what Barnes' impression of Auglaize County Municipal Court was but that fines ordered from citations were dispersed to many different agencies and that the court did not base its decisions on monetary gain to the county. The court then informed the parties that it would "probably be a couple of weeks" before a decision was rendered. At this point, Barnes stated: "I'm sorry I don't mean to interrupt." The court then stated that it needed to let some of the people in the courtroom leave and that it would let everyone know of its decision. Both the prosecutor and Barnes thanked the court and the matter was adjourned.

{¶29} Barnes contends that his statement, "I'm sorry I don't mean to interrupt[,]" was his attempt to request closing argument, having been informed by the prosecutor and the court that he would have the opportunity to address the court after his testimony. Thus, he maintains that he did not waive closing argument. We disagree with Barnes in two respects.

{¶30} First, while Barnes did ask *if* he would be allowed to address the court after concluding his testimony, he did not subsequently request to be heard in summation. Instead, he proceeded to provide the court with his interpretation of the evidence presented by both the State and himself, to comment on the reliability of the evidence, and to challenge the motives of the State and its witnesses. As

-17-

previously noted, nothing in the "testimony" he provided after being asked if had any additional testimony could be described as evidence. To the contrary, it was an argument about the evidence that had been introduced for both parties. Thus, although Barnes was not specifically told at a certain point that he could be heard in summation, the trial court actually heard his summation of the evidence. Accordingly, he was not totally denied of the opportunity for final argument as *Herring* prohibits.

{¶31} Second, Barnes' attempt to interrupt the trial court as it informed the parties that it was taking the matter under advisement did not evidence his request to be heard in closing argument. Rather, he could have been attempting to interject in any number of ways. For instance, in his brief to this Court, Barnes asserts that during the trial, the court did not permit him to make a motion to dismiss his case or to address what he perceived to be discovery violations by the State.[4] Thus, he may have intended to move to dismiss the case, to discuss the evidence he sought from the State, or to otherwise address the motion he filed with the court the morning of his trial regarding discovery. This Court is not permitted to simply guess at what objections, requests, and/or statements Barnes may have

---

[4] Barnes maintains that the State did not provide him with a copy of the video from Trooper Keaton's cruiser. He asserts that this video shows that there was only one patrol car in the area, as opposed to cars, plural, as testified to by Trooper Pilot Justice. Thus, he maintains that what the pilot thought was an additional patrol car was most likely another white vehicle, which would have been the actual vehicle that was speeding rather than him. The record contains no cruiser video and the transcript of the trial in this matter does not reflect that a video was introduced. Moreover, Barnes has not shown that a video of the incident even exists. Therefore, this Court is unable to address this aspect of Barnes' argument.

intended to make. Therefore, we do not find that this statement amounts to a request for closing argument or an objection to what he perceived was the trial court's omission of his closing argument. By not stating anything specifically on the record, Barnes waived his right to closing argument.

{¶32} In addition, there is no plain error in this case because, similar to *McCausland*, there is no indication that the outcome of this trial would have been different had a closing argument been made. See *McCausland*, 2009-Ohio-5933, at ¶ 15, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, 2002-Ohio-68; Crim.R.52(B). As previously noted, there were only three witnesses, the issues were simple, and the trial was brief. Accordingly, even applying a plain-error analysis, we would find nothing in the record to indicate that the outcome of Barnes' bench trial would have been different had he presented a closing argument when prompted by the court rather than on his own accord. Thus, the first assignment of error is overruled.

{¶33} For all of these reasons, the judgment of the Municipal Court of Auglaize County, Ohio, is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., and ROGERS, J., concur.**

**/jnc**