OPINION
{¶ 1} Defendant-appellant, Shaiton Andrews, appeals his conviction in the Court of Common Pleas, Allen County, Ohio, on two counts of aggravated robbery in violation of R.C.2911.01(A)(1), both first degree felonies, and both including a firearm specification pursuant to R.C. 2941.145(A).
 {¶ 2} The charges stem from two robberies that occurred on December 1, 2004 in Lima, Ohio. The first robbery occurred at Lynn's Pawn Shop; two men entered the store and one immediately went into the back room which contained music equipment. The other man then approached the counter and spoke with the owner, Lynn Lamb, about selling some gold chains. The first man then sprang from the back room, pointed a gun at Lamb, ordered her to get down on the floor, and demanded money. The two men then broke the glass display case in front of the register and began removing the contents. They tied Lamb up, and eventually left with over $18,000.00 in stolen goods and $1,000.00 in cash. Unbeknownst to them, Lamb had installed a video surveillance camera which captured the entire robbery on videotape. Lamb later identified the defendant as one of the men who robbed the store, and described him at trial as wearing a distinct jacket with dragons or snakes on it.
 {¶ 3} The second robbery occurred the same day at Crazy's Wings and Things, a carry-out restaurant that was also located in Lima, Ohio. The owner of the restaurant, Bruce Bradshaw, testified that on December 1, 2004 a man came into store at about 9:20 a.m. and purchased a beverage. Bradshaw also talked to the man briefly about the menu, and the man asked about some cigars that Bradshaw also sold. Approximately one hour later, the same man came into the store while Bradshaw was in the kitchen preparing food for that day's lunch specials. Bradshaw saw the man from his vantage point in the kitchen, and went out to meet him at the counter. Moments later, another man came from around the corner, pointed a gun at Bradshaw and demanded money. The first man then reached over the counter and attempted to open the cash register but was unsuccessful. He then ordered Bradshaw to open the register and take out the cash drawer, and Bradshaw complied. Bradshaw then tripped a silent alarm, but one of the robbers saw him do so; the man with the gun then threatened to shoot Bradshaw. The robbers then fled the scene, but only after the man with the gun fired one shot, which lodged in the counter. Bradshaw was not physically injured.
 {¶ 4} The police later showed Bradshaw the videotape from the pawn shop robbery, and Bradshaw identified the perpetrators as the same men who had robbed his restaurant. He noted that they were dressed the same way, and also indicated that they had the same mannerisms.
 {¶ 5} The police also gave the videotape recording of the pawn shop robbery to two local televisions stations, who broadcast the tape on the local news program. Following the broadcast, a woman named Diana Ross came forward and told police she knew the subjects on the tape. Ross was the mother of one of the subjects' girlfriends, Tarissa Ross, and she identified that subject as Shaiton Andrews, the defendant. The police then went to the house where Tarissa and Andrews were staying, located the defendant and took him into custody. They searched the residence, and found a hat and a pair of sunglasses that were similar to ones seen on one of the men in the videotape of the pawn shop robbery.
 {¶ 6} Andrews was indicted on two counts of aggravated robbery in violation of R.C. 2911.01(A)(1) with two accompanying firearm specifications. He was appointed counsel, but counsel later moved to withdraw from the case, which the trial court permitted. New counsel was appointed, but Andrews indicated to the court that he wanted to proceed as his own attorney. A hearing was held on this request, and following a colloquy with the defendant the court permitted him to proceed pro se; however, the court also asked his appointed counsel to serve as shadow counsel.
 {¶ 7} A jury trial was commenced on August 29, 2005, and the jury returned a verdict of guilty on both counts as well as on the firearm specifications. Andrews was then sentenced to consecutive ten year prison terms on the two aggravated robbery charges, and to consecutive three year terms on the firearm specifications for a total of twenty-six years in prison. Andrews now appeals, asserting four assignments of error.
 Assignment of Error 1 The trial court erred in not following the requirements ofCriminal Rule 44(C).
 {¶ 8} In his first assignment of error, Andrews argues that the trial court erred by failing to have him sign a written waiver of his right to counsel pursuant to Crim.R. 44(C), which provides:
Waiver of counsel shall be in open court and the advice andwaiver shall be recorded as provided in Rule 22. In addition, inserious offense cases the waiver shall be in writing.
 {¶ 9} In the instant case, the charges of aggravated robbery constitute a "serious offense" because they carry a potential prison sentence of more than six months. See Crim.R. 2(C). Unfortunately, the record is devoid of any written waiver of the right to counsel, and the State concedes that no written waiver was acquired. However, we find that the trial court substantially complied with the requirements of Crim.R. 44(C) and therefore the failure to obtain written waiver constitutes harmless error.
 {¶ 10} The Supreme Court of Ohio analyzed the requirements of Crim.R. 44 in State v. Martin, 103 Ohio St.3d 385,816 N.E.2d 227, 2004-Ohio-5471. In Martin, the Court first examined Crim.R. 44(A), which permits a criminal defendant to knowingly, intelligently, and voluntarily waive the right to counsel. The Court determined that "when a criminal defendant elects to proceed pro se, the trial court must demonstrate substantial compliance with Crim.R. 44(A) by making a sufficient inquiry to determine whether the defendant fully understood and intelligently relinquished his or her right to counsel." Id. at ¶ 39. The Court then held that "[i]f substantial compliance is demonstrated, then the failure to file a written waiver [pursuant to Crim.R. 44(C)] is harmless error." Id.
 {¶ 11} Andrews argues that the analysis of Crim.R. 44(C) inMartin was merely dicta because the Court in that case ultimately held that the trial court had not substantially complied with subsection (A) of the rule. He is arguably correct in that the Court eventually determined that the trial judge in that case had failed to sufficiently inquire whether the defendant was knowingly, intelligently, and voluntarily waiving the right to counsel. Id. at ¶ 45. However, the Court specifically held that only substantial compliance with subsection (C) was required: "While literal compliance with Crim.R. 44(C) is the preferred practice, the written waiver provision of Crim.R. 44 is not a constitutional requirement, and, therefore, we hold that trial courts need demonstrate onlysubstantial compliance." Id. at ¶ 38 (emphasis added). Moreover, the Court re-affirmed that position in its holding in State v.Cline, 103 Ohio St.3d 471, 816 N.E.2d 1069, 2004-Ohio-5701.
 {¶ 12} In Cline, the Second District Court of Appeals had reversed the defendant's conviction in the trial court because the defendant had not signed a written waiver of counsel as required by Crim.R. 44(C). State v. Cline, 2nd Dist. No. 2002-CA-05, 2003-Ohio-4712, at ¶¶ 12 41. The Second District determined that "a lack of a written waiver, required by Crim.R. 44(C), is a fundamental error that requires reversal." Id. at ¶ 11. The Supreme Court subsequently reversed that ruling in a one-paragraph opinion, citing only to the holding in Martin.Cline, 103 Ohio St.3d at ¶ 1. Thus, the sole grounds for reversal in that case is that literal compliance with the rule is not required; lack of written waiver is not reversible error so long as there is substantial compliance with Crim.R. 44(A).Martin, at ¶ 39. It is also important to note that the Court's decision in Cline occurred virtually simultaneously with itsMartin opinion, with Cline having been decided a mere two weeks after Martin.
 {¶ 13} Accordingly, our analysis in the instant case requires us to examine the record to determine whether the trial court substantially complied with the waiver requirements of Crim.R. 44(A). Substantial compliance in this sense means that under the totality of the circumstances the defendant subjectively understands the rights he is giving up by proceeding pro se. SeeState v. Nero (1990), 56 Ohio St.3d 106, 108, 564 N.E.2d 474
(defining "substantial compliance" in the context of Crim.R. 11). Specifically, the Court noted in Martin that a valid waiver "must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter."Martin, at ¶ 40 (internal quotes and citations omitted). If the trial court substantially complied with Crim.R. 44(A), then the failure to have Andrews sign a written waiver of his right to counsel, while error, must be deemed harmless. Martin, at ¶ 39.
 {¶ 14} A review of the record in the instant case indicates that the trial court substantially complied with the requirements of Civ.R. 44(A). After first verifying that Andrews wished to proceed without an attorney and advising him of the right to have a court-appointed attorney, the trial court informed him of the specific factors listed in Martin.
 THE COURT: Do you understand that the nature of the charges inthis particular instance — there are two —
 MR. ANDREWS: I understand.
 THE COURT: I have to make sure you understand. I have to makea record.
 That there's count one, that it's an aggravated robbery withgun specification, which is a felony of the first degree. Itcarries possible sentence of three, four, five, six, seven,eight, nine, ten years plus a gun spec which is another three,which could be a total of thirteen years.
 MR. ANDREWS: Yeah.
 THE COURT: Do you understand that?
 MR. ANDREWS: Yeah.
 THE COURT: And count two is also aggravated robbery, which isa felony one, same as count one, and this is a separate offense,allegedly happened on the same date, and carries a possiblesentence again, three to ten years, three, four, five, six,seven, eight, nine, ten years plus another gun spec for another —for a possible thirteen years, with a possible sentence of up totwenty-six years. Do you understand that?
 MR. ANDREWS: I understand there should be another spec onthere, too, right?
 THE COURT: There's two specs on each one, gun specs that carrythree years each.
* * *
THE COURT: And do you understand that you have the right tohave possible defenses, such as not being present, that there wasmistaken identity, that you were under the influence of possiblydrugs or alcohol, that these are possible defenses that anyonecould bring up. Do you understand that?
 MR. ANDREWS: Yes, I do, your honor.
 THE COURT: And do you understand that the court is verycautious in this regard and wants to assure you, Mr. Andrews thatyou have the right to an attorney and it is not wise to proceedon your own, as — representing yourself and that you should havecounsel with you during this time in representing you, do youunderstand that?
 MR. ANDREWS: I understand that I want to represent myself.That's what I understand. I'd like to represent myself,regardless of what's dangerous.
 THE COURT: And you understand that is — the court is advisingyou that that is not wise, that you should have counsel andyou're still wanting to represent yourself?
 MR. ANDREWS: I understand that the court have [sic] detainedme for this long of a period of time, so I think it's wise if Imake my own decisions.
 THE COURT: Very well.
Andrews also indicated to the court that he wanted to represent himself because he believed that his court-appointed attorney would work "more with the prosecution than with me." The trial court also verified that Andrews was aware the legal ramifications of self-representation — that he would be required to follow the rules of evidence and criminal procedure.
 {¶ 15} Based on the foregoing record, we find that the trial court substantially complied with the requirements of Civ.R. 44(A). Pursuant to the Supreme Court's decisions in Martin andCline, the failure to obtain a written waiver of counsel under Civ.R. 44(C), while error, must be deemed harmlesss. Accordingly, Andrews' first assignment of error is overruled.
 Assignment of Error 2 The trial court erred in overruling the defendant's motion tosuppress statements allegedly made by the defendant.
 {¶ 16} This assignment of error concerns a statement given by Andrews to the police while he was in custody. Andrews was being held at the Allen County Jail on the aggravated robbery charges at issue in this appeal. During this time, Andrews was transported to the Lima Police Department so that Detective Phillip Kleman could question him concerning a third robbery for which he had not been charged. Upon his arrival at the police department, Andrews demanded to know what he was being interviewed about, and Detective Kleman explained that a private citizen had reported that a robbery had occurred at his residence and that the victim had identified Andrews. Andrews then replied, "I don't rob people, I rob businesses." Miranda warnings were given immediately after the statement was made and prior to any questioning by Detective Kleman. In his second assignment of error, Andrews argues that the statement given to Detective Kleman should have been suppressed.
 {¶ 17} Andrews asserts two arguments in this assignment of error. First, he argues that the statements should be suppressed because they were given during a police custodial interrogation without proper Miranda warnings. Second, he argues that his Sixth Amendment right to counsel was violated when the police interrogated him without a knowing, voluntary, and intelligent waiver of the right to counsel.
 {¶ 18} With regard to the first argument, the issue is whether the statement occurred during a "custodial interrogation." The prosecution is prohibited from using any statements made by a defendant, whether exculpatory or inculpatory, during a custodial interrogation unless properMiranda warnings have been given. Miranda v. Arizona (1966),384 U.S. 436, 444, 86 S.Ct. 1602; see also State v. Mason
(1998), 82 Ohio St.3d 144, 153, 694 N.E.2d 932. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."Miranda, 384 U.S. at 444.
 {¶ 19} We first note that there is no question Andrews was "in custody" at the time he gave the statement. "A person is considered in custody for purposes of Miranda when he is placed under formal arrest or his freedom of action is restrained to a degree associated with a formal arrest." State v. Simpson,
Franklin App. No. 01AP-757, 2002-Ohio-3717, at ¶ 33 (citingMinnesota v. Murphy (1984), 465 U.S. 420, 434, 104 S.Ct. 1136,79 L.Ed.2d 409). "In judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a `reasonable person would have believed that he was not free to leave.'" State v. Gumm (1995),73 Ohio St.3d 413, 429, 653 N.E.2d 253 (quoting United States v. Mendenhall
(1980), 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497). In the instant case, Andrews was already being held on previous charges; there is no question that he was in custody for purposes of the Miranda rule.
 {¶ 20} However, we find that the statement at issue was made prior to the start of any "interrogation" by Detective Kleman. It is clear that Andrews was transported to the police department for interrogation; however, the question remains whether the interrogation had begun at the time Andrews made the statement. "Miranda does not affect the admissibility of `[v]olunteered statements of any kind.'" State v. McGuire (1997),80 Ohio St.3d 390, 401, 686 N.E.2d 1112 (citing Miranda,384 U.S. at 478. Statements given before questioning has begun must be considered voluntarily given and not made during a "custodial interrogation." McGuire, 80 Ohio St.3d at 401 (citing State v.Roe (1989), 41 Ohio St.3d 18, 22, 535 N.E.2d 1351. Moreover, "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." Arizona v. Mauro (1987),481 U.S. 520, 529, 107 S.Ct. 1931. The record indicates that Detective Kleman had not asked Andrews a single question before the statement was made; Kleman had only given the reason for the interview in response to a question posed by Andrews himself. Accordingly, the statement was not made during a custodial interrogation and need not be suppressed due to lack of Miranda
warnings.
 {¶ 21} Andrews' second argument, in which he claims that Detective Kleman's questioning violated his Sixth Amendment right to counsel, also fails. The right to counsel attaches once a defendant is charged with an offense, and prohibits the police and prosecution from conducting any interrogation once the right has been invoked. Maine v. Moulton (1985), 474 U.S. 159, 176,106 S.Ct. 477. "[T]he Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." Id.
 {¶ 22} However, the right to counsel is offense-specific, and does not prohibit police asking questions to a defendant pertaining to offenses for which he has not been charged. SeeMoulton, 474 U.S. at 179-81. The Sixth Amendment only limits the government's investigative powers with respect to pending charges, it does not limit the state's ability to investigate other crimes. Id. at 180.
 {¶ 23} In the instant case, the Sixth Amendment was inapplicable because Detective Kleman brought Andrews in for questioning about a separate offense for which he was not charged. Thus, there is no Sixth Amendment violation because the police were not knowingly attempting to circumvent Andrews' right to counsel. See Id. at 180-81.
 {¶ 24} Based on the foregoing, Andrews' second assignment of error is overruled.
 Assignment of Error 3 The trial court erred in not ruling on the Defendant's motionto sever.
 {¶ 25} In this assignment of error, Andrews argues that the trial court erred by failing to rule on his motion to sever the charges against him into separate trials. Crim.R. 8(A) permits a court to join multiple charges against a defendant if the charges "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Moreover, "it is well settled that the law favors joinder."State v. Waddy (1992), 63 Ohio St.3d 424, 429, 588 N.E.2d 819. It is clear in the instant case that joinder was permissible under this rule, because the two aggravated robbery charges are unquestionably of the "same or similar character," and arguably were part of a course of criminal conduct.
 {¶ 26} However, Andrews argues that the trial court should have severed the charges in accordance with his motion. A criminal defendant is permitted to seek severance of the charges under Crim.R. 14, which provides:
If it appears that a defendant or the state is prejudiced by ajoinder of offenses or of defendants in an indictment,information, or complaint, or by such joinder for trial togetherof indictments, informations or complaints, the court shall orderan election or separate trial of counts, grant a severance ofdefendants, or provide such other relief as justice requires.
Crim.R. 14. Thus, the court is required to sever the charges when prejudice will result from joinder of offenses at trial. However, a defendant claiming error in the trial court's refusal to sever offenses or defendants has the burden of affirmatively showing that his rights were prejudiced by the joinder. State v.Torres (1981), 66 Ohio St.2d 340, 421 N.E.2d 1288, syllabus.
 {¶ 27} When a defendant claims that he was prejudiced by the joinder of multiple offenses, a reviewing court must determine: "(1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." State v. Schaim
(1992), 65 Ohio St.3d 51, 59 (citations omitted). Moreover, "[i]f the evidence of other crimes would be admissible at separate trials, any `prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." Id. at 59 (quoting Drew v. UnitedStates, 331 F.2d 85, 90).
 {¶ 28} Thus, our primary inquiry is whether the evidence of one robbery would have been admissible in a second trial on the other charge. That determination is governed by Evid.R. 404(B), which provides:
Evidence of other crimes, wrongs, or acts is not admissible toprove the character of a person in order to show that he acted inconformity therewith. It may, however, be admissible for otherpurposes, such as proof of motive, opportunity, intent,preparation, plan, knowledge, identity, or absence of mistake oraccident.
Under this rule, evidence presented of one of the robberies would have been admissible in a trial on the second robbery as proof of similar modus operandi. See Waddy,63 Ohio St.3d at 429. The fact that the two robberies in question occurred on the same date, within a close geographic proximity, with the same accomplice, and under similar circumstances goes to demonstrate proof of intent and plan. Moreover, the primary evidence in question, the videotape of the robbery at Lynn's Pawn Shop, would have been admissible in a second trial because the owner of the restaurant identified Andrews from that video. Accordingly, it would have been admissible under Evid.R. 404(B) as proof of identity.
 {¶ 29} Therefore, the evidence presented at trial would have been admissible in a second trial under the rules of evidence, and the trial court would have acted within its discretion in choosing not to sever the offenses. It is clear that the trial court erred in failing to rule on the motion; however, due to the fact that Andrews is unable to demonstrate any prejudice as a result of joining the offenses, any error on the part of the trial court was harmless. Accordingly, Andrews' third assignment of error is overruled.
 Assignment of Error 4 The conviction is against the manifest weight of the evidence.
 {¶ 30} In his final assignment of error, Andrews argues that his conviction is against the manifest weight of the evidence. When reviewing whether a verdict is against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror" and examines the conflicting testimony. State v. Thompkins
(1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. An appellate court must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 387 (quoting State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717).
 {¶ 31} In making this determination, the Ohio Supreme Court has outlined eight factors for consideration, which include "whether the evidence was uncontradicted, whether a witness was impeached, what was not proved, that the reviewing court is not required to accept the incredible as true, the certainty of the evidence, the reliability of the evidence, whether a witness' testimony is self-serving, and whether the evidence is vague, uncertain, conflicting, or fragmentary." State v. Apanovitch
(1987), 33 Ohio St.3d 19, 23-24, 514 N.E.2d 394, citing State v.Mattison (1985), 23 Ohio App.3d 10, 490 N.E.2d 926, syllabus. Ultimately, however, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin,20 Ohio App.3d at 175.
 {¶ 32} In the case sub judice, we cannot find that the trier of fact lost its way or committed a manifest injustice. At trial, both the owner of the restaurant and the owner of the pawn shop testified about the events that occurred in their stores. Their accounts were strikingly similar: one man approached the counter, and as he was talking to the owner another man came around the corner brandishing a gun. The man with the gun demanded cash, and the man who had approached the counter grabbed the cash register drawer at the restaurant as well as several items from with the glass case at the pawn shop. The prosecution also produced a videotape surveillance recording of the robbery that occurred at the pawn shop, and the pawn shop owner identified the defendant in open court as one of the men who robbed his store. The restaurant owner also identified Andrews from the videotape as one of the men who had robbed his restaurant.
 {¶ 33} Moreover, a search of Andrews' residence upon his arrest uncovered a hat and sunglasses similar to those worn by one of the suspects on the videotape. Andrews' former girlfriend, Tarissa Ross, identified these items at trial as belonging to Andrews. She also testified that she watched the videotape and identified Andrews and his brother as the offenders.
 {¶ 34} Another witness, Martel McKee, who was Ross's brother-in-law and also knew the defendant, testified that he found a jacket in his garbage can a few days after the robbery. His mother-in-law, Diana Ross, who was also Ross's mother, identified the jacket as belonging to Andrews. Both McKee and Diana Ross identified the jacket at trial, and Ross indicated that it was the same jacket Andrews was wearing in the video of the pawn shop robbery. Finally, McKee testified that he received a letter from Andrews while Andrews was in jail. In the letter, Andrews stated that he knew the police were asking McKee to testify about the coat he found in his garbage can. Andrews then told McKee that he was being "railroaded" on the robbery charge and asked McKee to "stay away from the courthouse" and to "[t]ell [the police] that it wasn't my coat."
 {¶ 35} The evidence presented was uncontradicted and unconflicting. There is also no reason to question the reliability of the testimony. Three separate people identified Andrews from the videotape as having been one of the two men who committed the pawn shop robbery, and the restaurant owner also identified him as one of the men who committed the second robbery. Thus, the weight of the evidence falls in favor of conviction.
 {¶ 36} Based on the foregoing, we find that Andrew's conviction was not against the manifest weight of the evidence. The fourth assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
 Bryant, P.J., concurs.
 Rogers, J., concurs separately.